We've got plenty of lawyers per square inch, I think, for the Attorney General. Mr. Miracle. May it please the Court, Your Honors, in entering the preliminary injunction below, the District Court in one sweeping order has judicially expanded the statutory language of the Communications Decency Act, and in doing so, has halted the Attorney General's investigation, consumer under state law, which has not been challenged by Google in this case. While the lower court's order casts the injunction in terms of Google's desire to maintain the status quo until the court determines the extent of Google's responsibility under the law, what this injunction has done is usurp the state's sovereign authority to investigate, and if warranted, bring a suit under its consumer protection laws. And the injunction does so in the absence of any across-the-board federal immunity prohibiting the state's investigation. Your Honors, we submit that the District Court abused its discretion in failing to abstain under Younger v. Harris, and while the standard of review is an abuse of discretion standard, this Court reviews the application of the three Younger factors de novo. Neither, Google does not seriously contest the first two parts of Younger, so I'm going to focus on the ongoing proceedings. The lower court found that there were no ongoing proceedings, and that the issuance of an administrative subpoena did not constitute an ongoing proceeding for purposes of Younger abstention. We disagree, and we believe that under this Court's decision in Texas Association Business v. Earle, 2004 case, there the Court said that the issuance of compulsory process, including subpoenas in criminal cases, initiates ongoing proceedings for the purpose of Younger abstention. But Earle's a grand jury subpoena. Yes, but they talked about, and if you look at the logic in what NOPC, what the U.S. Supreme Court said in NOPC, there the Court said it talks about judicial in nature, which means a state process that investigates and declares and enforces the liabilities as they stand at present. The Consumer Protection Act, upon which this subpoena was issued, has a number of things that are akin to criminal-type proceedings. This is not necessarily just a criminal-type proceeding, but this is a state—the state statute is a hybrid civil and criminal statute. So, he has the— Right, but the scene, they cite, and you didn't respond to it in your reply brief, Louisiana debating. Same hybrid arrangement. Your Honor, but the— Why did you distinguish Louisiana debating? We believe NOPC is controlling in terms of the fact that this is judicial in nature. The state— This is judicial in nature. An investigative demand by an executive officer is judicial in nature? How's that? Under the statute, Your Honor, Judge Higginson, the Attorney General has the ability to impanel, call witnesses, subpoena documents, issues cease and desist— But the commission in Louisiana debating, that's a published Fifth Circuit opinion, had that same authority. Well, Your Honor, we contend that this is still under Earl— But Earl's a grand jury case. No one disagrees that grand jury subpoenas invoke judicial machinery. Then we don't want to step in because that's going to be duplicative federal judicial machinery on top of state judicial machinery. But the grand jury doesn't operate for the Attorney General. He's made an investigative demand. In the absence of the ability to make that investigative demand, and I think it's important that the court in the Spitzer case specifically said, Younger's principles extend to civil and administrative proceedings. They are an integral part in potential proceeding against plaintiffs and without such subpoenas, Attorneys General can seldom amass the evidence necessary to commence the fraud action. So it's a— Why isn't—I mean, what circuit has said that the line isn't one of a threat of enforcement, no judicial proceedings, no comedy problem, no duplicative—we're not doubting that state courts can enforce the constitutional principles here—versus actual enforcement proceedings? Threat of enforcement, Younger doesn't apply. Enforcement, Younger applies. The statute contemplates under which the subpoena was issued, the statute contemplates the enforcement proceeding. I mean, it's the— Right, but you've got—right, but you've got to then—you've got to give notice, you've got to have a hearing, and you've got to get an order from court. Then you've got a civil proceeding. And Google had every opportunity to avail itself of that state court— But it hasn't happened. Your Honor, we believe that they had that opportunity, and we believe that the institution of the civil subpoena was sufficient to trigger under Earl. Okay. We believe that this court should reverse and render as to Younger abstention. Now, with my limited time left, I'm going to address the injunction itself, and we believe that the lower court abused its discretion in granting the injunction. The injunction is broken down into two grounds. One, the first— Well, before you do that, for me, this case starts and maybe stops at the district court's finding that Google presented significant evidence of bad faith. And once that factual finding has been made, my question to you is, in the existing record, where do you point us to to have us conclude that that factual finding is clearly erroneous? Your Honor, the record itself—and there's a number of citations in the record where we believe that bad faith finding was clearly erroneous. And first of all— But that's exactly what I want. Where in the record? Give me a specific record site, because you offered very little exhibit evidence and no witness testimony, nor did they, below. But yet the district court comes to a bad faith finding. That would get you around Younger, no matter what your other arguments are. It would get you to a First Amendment retaliatory claim. So we've got a factual finding of bad faith that this isn't investigative. This isn't looking for criminal activity. This is to, you know, retaliate against protective CDA, immunized activity. I would point the court to record ROA 596, where Google says, in a letter to the Attorney General, Google has voluntarily and in good faith made considerable strides in addressing the kinds of issues raised in our meetings. Understand that over a course of 18 months, the Attorney General and Google and other parties were engaged in dialogue, including attorneys generals from many other states. Google likes to portray this as the Attorney General making threats and demands. There was an ongoing dialogue between Google and the Attorney General. ROA 596, ROA 599, Google has taken very seriously your complaints about autocomplete listings. Right. But that ongoing dialogue precedes the subpoena drop, right? Am I correct that once you gave the subpoena, you refused to narrow it? No, Your Honor. That is actually not correct. We agreed to actually postpone Google's request. You agreed to postpone. But did you agree to narrow any of the provisions in the requests? Not in the time that we were negotiating, and during that time, January 5th was the due date for the subpoena, and they filed a lawsuit on December 19th. So during this time, Google was talking with counsel in our office to discuss that issue, and then on December 19th, they filed a lawsuit. But Google ties the issuance of the subpoena. They tie all the things leading up to the issuance of the subpoena, so I don't think you can necessarily separate them and say the dialogue that was going before the issuance of the subpoena can be separated from the issue. Well, in fact, that's what the district court relies on to conclude bad faith. It is, and that's where we think it was clearly erroneous to say that because there were statements made and then, ergo, the subpoena was issued, there is no other factual analysis other than a conclusion in the district court's order that that constituted bad faith, and I might also add that the court said may be bad faith based upon the district, based upon the attorney revelation. So it certainly was not a conclusive finding, and it was almost as if it was indicted because he had already foreclosed the other younger factors and said bad faith. But I would also point, Your Honor, to Judge Higginson, to ROA 603. Google continues to be open to feedback about the next further and additional steps it can take to address the abuse of its systems by rogue actors. In this spirit, Google continues to incorporate suggestions for filters and algorithmic changes to auto-complete systems. Likewise— But, I mean, you're right. I mean, in my way of thinking about this case is that you two have vastly more common ground than you don't in that both of you want to stop criminality, child pornography, any of these things, and therefore the dialogue's appropriate, but then the subpoena here is terms that are extraordinarily broad, like anything you've considered ever to remove any YouTube that could be dangerous. How—how—that—if they take off 180 million YouTube photos in just 2014, how are they going to comply with that? Your Honor, that's why this is a—this is a motion to quash if it's anything, and that's why the state court proceeding is designed if the attorney general, because this subpoena is not self-executing, if the attorney general filed the enforcement action, they could raise all these issues. This is a motion to quash. They concede they would respond to a more narrowly tailored subpoena, so right there that throws out the retaliation claim, because they never say, well, if you'd asked us ten fewer questions or ten fewer pages, that we—we would deem that non-reliable. So you think if they file a motion to quash Mississippi Civil Rule 45, like R-17, at that point you guys will go through it line by line, and you'll take out, for example, any information that is covered by the CDA immunity provision? Yes, that would be the process. Let me just point to—they make a big, big production of the definition to include things that are covered or not covered by the CDA, and the reason that has to be there is if we said produce documents that are—you don't think are third-party content, we're liable to get no documents if their position is everything's third-party content. So there clearly has to be an analysis of what is and what isn't third-party content, and I see my time is up, unless you have any further questions. Mr. Miracle, I'm going to give you a December 1st bonus. I'm going to give you two more minutes to say whatever else you want to say about the injunction, since most of that was on the bad faith, which was important, but since you only got two minutes for rebuttal, I'm going to give you two minutes. Thank you, Your Honor. Say whatever else you want to say about the injunction, which I'm assuming, and if the other side needs the two, I'll even-handedly give you the other two. So it doesn't guarantee you won't get any questions. I'm just giving you two minutes if there are other points about the injunction you wanted to make. Thank you, Judge Stewart. Yes, as to the likelihood of success, the Communications Decency Act, that is a non-starter because we know from existing cases where Google, particularly in the Perfect 10 case, has been a defendant. In a motion-dismiss stage, they raise the CDA, and the court says it's improper, it's an affirmative defense, and it's a fact-intensive inquiry. So we know in an actual filed lawsuit that just raising it and saying third-party content, courts have already recognized that that is not a valid argument. We're one step removed from an actual filed lawsuit with actual claims and actual documents to look at, and there's certainly no textual support whatsoever in the CDA to say that an investigation is somehow prohibited under the CDA, and I would point the court to Section E3, which says that no cause of action may be brought and no liability may be imposed. So that contemplates that obviously a lawsuit has to be filed. Now, if Google wants to raise the CDA as a defense in that lawsuit, that's perfectly fine, but nothing in the CDA text itself lends any support to the notion that it can be used as a sword during an investigation to go to federal court to get an injunction over a state law investigation. So we believe the district court committed abusive expression by finding there was a likelihood of success on the merits as to the CDA. And in fact, he didn't even say—he said Google wants to maintain the status quo while the court determines the extent of Google's responsibilities under the law. Well, that's what the Attorney General's investigation was trying to do when it was improperly halted. So we can see that— Has any search company like Google ever been found to have prosecuted and convicted for in state court, in Mississippi or anywhere? Not that I'm aware of, Your Honor. They were—they entered into the $500 million non-prosecution agreement. That's the federal— That's the federal— But you're not aware of any state ever getting a conviction for a consumer protection violation against what I'm thinking of as a search engine company? My time has expired, but if I can respond to your question, I'm also not aware of any case where an injunction has been granted to stop an investigation that may have led to a consumer protection prosecution or civil action. All right. Thank you, sir. You do have some rebuttal time. All right. Mr. Clement, you're up. You're representing the amicus? That's right. Good morning, Your Honor. I'm pleased to court Paul Clement for the amici including 39 states and the District of Columbia's Attorney General. The reason that 40 states are here is because the injunction here, which is effectively a federal court action to quash a state subpoena instead of going through the state court process, is a grave threat to state law enforcement across this country. I also think it is fundamentally inconsistent with younger principles and basic injunctive principles. Because to your point, Judge Higginson, I want to respond on the younger points, but also to the extent that you don't think this is sufficiently coet to qualify for younger purposes, that just shows there's absolutely no irreparable injury here. Well, that's getting to your standing rightness type argument. That's not— I think of it actually as just the four factors in a preliminary injunction. The sine qua non of a preliminary injunction is you have to show irreparable injury. And when your irreparable injury is said to flow from a non-self-executing subpoena that doesn't have any impact on your primary conduct unless and until it's enforced by a court pursuant to a return date where you have a court hearing, an opportunity to file a motion for quash, there's no injury at all, let alone any irreparable injury. And that's an independent ground to reverse this injunction, which, frankly, I mean, even if you wanted to get around the bad faith finding, I mean, bad faith is relevant to younger, but bad faith is not an exception to the idea that somebody who wants a preliminary injunction has to show irreparable injury. Now, as to the bad faith— On the First Amendment context, though, the showing of a chilling, a hardship, you know, this may get you towards the 28-J filing of Judge Posner's decision yesterday, whenever it was. Why wouldn't the same veiled threats brought against Backpage by the sheriff be equivalent to the conversation that's been described by the district judge here? Well, here's what I would have to say to that, and I think I'd actually also like to eventually file a 28-J letter in response to that. But, you know, Judge Posner, in his opinion, says near the end of it that the sine qua non for a preliminary injunction is irreparable harm. What makes the irreparable harm there, and Judge Posner says this, is that the Cook County Sheriff there was not invoking any process at all against Backpages. He was going against the third party, the credit card companies, and therefore Backpages had no state court proceeding where they could do anything. And, you know, the way I read Judge Posner is he almost takes the Cook County Sheriff to task for not having the courage of his convictions and actually bringing in action against Backpages. Well, here the attorney— How does Backpage have standing in that case to object on behalf of the credit card companies? Well, that wasn't the theory.  The theory was that that was a direct threat to their ability to operate, and without the credit card companies, First Amendment activity would cease. Now, I want to get back to Younger, but just if you think about it, one of the things that's really missing here with the district court's analysis is it sort of waives the First Amendment and suggests that makes all of the sort of problems go away and First Amendment injury is irreparable harm sort of per se. Part of the problem with that is Google never identified and the district court never identified what is the First Amendment activity here that was stopped in light of the subpoena and would be renewed once the preliminary injunction issued. This would be a different case if Google, you know, basically said, in light of the subpoena, we're going to shut down our autocomplete feature because that's our own speech. We might be on the hook for that. We're going to shut it down unless and until we get a PI. They don't have anything like that. They point to some conduct that they changed voluntarily in response to the earlier colloquies with the attorneys general. As to that, they don't say that with the preliminary injunction, they've revived any conduct that they ever stopped at any point on the spectrum. So I don't really— I keep thinking neither party briefed it, but I'm sure you know the case. Our enterprises, the little Brooklyn adult bookstore. Right. Federal subpoena dropped on them. Give us your customer list for your adult bookstore clients. Well, at that point, you've got a substantial First Amendment concern, enough that the Supreme Court has the least conceivable relevance to a criminal statute. Sure. You can't be harassing them for their activity. And that is a First Amendment defense that Google can bring equally in state court as it can bring in federal court. Right. Okay. And that brings us back to two points. And they're both fatal, I think, to Google's effort to go into federal court and get this injunction. One is, as I've noted, it's a non-self-executing subpoena. There is no irreparable harm. But independent of that, there is a huge federalism, a huge younger problem here. And I want to make two points—well, three points. First on bad faith. This is not a bad faith finding that you can defer to. It is a finding that, quote, on page 14 of the district court's opinion, that the conduct of the attorney general may evidence bad faith. I mean, you know, I may or may not get on my flight today. But above that, they say presented significant evidence of. But you have to make a finding of bad faith before you get around younger. And that is a very big deal. I've looked at the Supreme Court cases. The Supreme Court of the United States has never made a finding of bad faith in a younger case because it would be a very big deal for a federal court to make a finding that a state investigation was done in bad faith, especially one like this, where there's no prior history. There's nothing to suggest. You know, as I look at what happens here, what happened here happens to a lot of my clients, frankly, which is, you know, some law enforcement agency says, we want you to change your conduct. My client tells them, we're not going to change your conduct. They say, well, if you're not going to change your conduct voluntarily, we're going to start investigating and we're going to give you a subpoena. And then the subpoena comes. Now, every one of my— Your client calls you and you file a motion to quash? I certainly—I must be committing malpractice because I would not have said, well, I got a great idea. Let's not file a motion to quash in state court. Let's go to federal court. And not only can we get a federal court to quash this thing, but if I'm successful, I'll get my attorney's fees so you won't even have to pay me. Isn't that essentially what happened in Louisiana debating or Steffel, both cases? You come to federal court to enjoin the state executive officer that's acting in bad faith? Well, first of all, we don't have bad faith here. I don't think this is a valid finding. But second, that really brings us to the two related questions. One is younger. One is irreparable injury. At this point, you have to show some irreparable injury before you get this extraordinary injunction and a non-self-executing subpoena doesn't get you there. Now, that brings us to the rest of the younger analysis. And there's really two points I'd like to make on that. One is, Google brings up the Sprint case as if Sprint was somehow just like a watershed and like youngers hanging by a thread after a sprint or something. Now, all Sprint held, as I read that decision, is that some of the loose language in middle use to create essentially a fourth category of younger extension. But the three sort of core categories, criminal proceeding, a civil enforcement proceeding, and an enforcement to enforce a state court judgment, all three of those are alive and well. And so nothing about Sprint affects what I think is the only hard question as to younger abstention here, which is whether the civil enforcement proceeding, which is clearly what's contemplated here, is sufficiently far along for it to be pending. What's your best case for non-grand jury investigative demands by an executive officer? Can I give you two? Okay, yeah. Because I would like to point you to Judge Kimba Wood's analysis in the Seligman case, because that is... Southern District of New York. Southern District of New York on all fours with this case in the sense that it is a civil investigatory opinion. I think it's the Martin Act. I think it's very similar to this statute, which ultimately could be enforced. And then the eighth circuit, Kaler. What's that? What's, sorry, the second case? And the second case is Traynor against Hernandez, a Supreme Court case. And I would particularly ask you to focus on footnote nine of Traynor. Because in footnote... The Traynor case involves a civil effort to get back some welfare payments by the state authorities that were said to have been garnered falsely. And there's two proceedings there. One of them is a writ of attachment. And there's one point in the argument, and this is why footnote nine is so critical, where they actually focus just on the writ of attachment and ask whether that alone would be a pending proceeding for younger purposes. And what the court says in footnote nine is yes. And what it points to is the fact that the writ of attachment has a return date and would be subject to a motion to quash in state court. Hadn't been filed yet, but it was subject to a motion to quash. That sounds an awful lot like a subpoena. What was the name of the case? Traynor against Hernandez. That one, the other one. Oh, the other one is the Seligman case? That's in your briefs. That's in the briefs. I mean, Traynor is cited in the briefs. I'm not sure anybody focused on footnote nine. That's something I came across in getting ready for the argument. And I see my time is up. All right. Thank you, sir. All right. Let's hear from Google. Mr. Nieman. Good morning. May it please the court. I'd like to go right to the point you made, Judge Higginson, about bad faith, because I think it does actually by itself decide this case. And there was very substantial evidence, as the district court found, of bad faith here. And when you asked Mr. Maracle to identify what he thought was the evidence that there wasn't bad faith, it was really quite striking, because he didn't point to anything that related to what the attorney general's motives were, what his purposes were, what the nature of his requests were. He pointed to the fact that Google, during the course of the investigation, was polite. And respectfully, I don't think that's any evidence at all of whether his investigation was conducted in bad faith. Here's what the evidence was on bad faith. You had, first, the attorney general demanding, repeatedly, censorship. Take out of search results websites that the Motion Picture Association, this business group that's been lobbying me, doesn't like. Repeated demands for that. Threats. If you don't do it— But there'd be nothing wrong with a victim to go to the attorney general and say—and Google wants to know if there actually is a pirated film, right? Sure. But here's the difference, right? Congress has passed, in the Digital Millennium Copyright Act, a procedure where if you identify a specific film or a specific webpage that has infringing content on it, you go and you give a notice of that and Google takes it down. They do it 200 million times a year. That's not what the attorney general was demanding. He was saying, if there's a website that has some infringing content down, take down the whole website. Not just the stuff that's been identified as infringing, but everything. It's like going to a library and saying, look, you've got some books by this publisher. Some of them are obscene. Take out of your library all the books from this publisher. It's a gross First Amendment violation. It's something the attorney general had no power to demand. It's something that the Motion Picture Association went to Congress and asked them to pass and they refused. So that was the demand. And we've interpreted that provision in our MySpace decision. Yes. Right. And pretty clearly we say, go after the people that are creating the content. Don't go after the publishers. Exactly right. Okay, but what's the case that applies that immunity provision to an investigative context as opposed to an existing enforcement action? Well, I think there is no case that applies CDA in the pre-litigation context. There are a number of cases that say part of the purpose of this immunity is to protect you from the burdens of litigation and that one of those burdens is the burden of responding to burdensome discovery demands. And therefore, after the case has been filed context, the number of cases like Nemet from the Fourth Circuit, Ben Ezra from the Tenth Circuit, that say you've got to stage the lists, but you can't do your full discovery until we've resolved that issue. And I think that's the rule in the post-filing context and it seems to me the same rule ought to apply because it's exactly the same burden in the pre-filing context. We don't have a case that squarely holds that and I'll readily ignore it. That's sort of important because without the CDA immunity, you know, as a former prosecutor, what I think of here is you've got an attorney general around the country, this one in particular, desperately trying to respond to online criminality. And there's a lot and you don't dispute that there is, right? So they've got to calls about price gouging, Cyber Monday yesterday, illegal trafficking people, drugs, all of that. They do properly have jurisdiction over. Absolutely. And Google is assisting them enormously. But their view is you can't just say trust us, right? Sometimes banks collude with embezzlers and in that context, they file, it's a first request for information. It's full of a lot of atmospherics where they're telling the public, we're going to make sure Google's clean. But fundamentally, the only step they've taken is a first subpoena and it's money and time, but every big company responds to those. Actually, I don't think that's the only thing that they've done here because we have not just a subpoena, but we have repeated demands for censorship and we have repeated threats of prosecution. The day before we filed- Give me your best threat to you for prosecution. As distinct from a public statement that we're public, we're going to fulfill our duty to the day before we filed this lawsuit, the Attorney General held a press conference. I know, press conference. But when have they indicated to you, here's a criminal statute we're going to use against you? Have they ever said that? Well, they've cited the Mississippi Consumer Protection Act, which is both a civil and a criminal statute. But that's the support for the subpoena. They just say pursuant to the Mississippi- No. Respectfully, let me just point to a few things in the record. If you ... When he sent us a letter in November of 2013, a letter that the record establishes was drafted by the Motion Picture Association and signed by Attorney General- But you keep saying that, but what's wrong with a victim assisting an executive? Nothing. Nothing wrong with- So what does the letter to you say? What's the crime they say? To avoid further liability, Google must change. Okay. Let's do this. Iterate first what you say the evidence is, then let's come back in terms of unpacking it. So the question put to you was, what is it? Iterate what you say it is, hold it. Sorry. Iterate what you say it is, and then we'll know what you're saying it is. And then we can take some time, rather than going through it and never- I'm happy to do it that way, Judge. All right, let's go. And identify if it's in the record. So these are all in the record. So the first thing that we have is we have a demand for something that is well beyond the Attorney General's authority to insist upon, and it's a form of censorship. And that raises significant First Amendment concerns when a state official is demanding that you censor. Okay, that's first. Second, we have- Okay, I'm sorry. I have to ask for a record site. Where did the Attorney General demand that you censor? Just give me a record page. I'll look at it. You don't have to quote it. What's the record? So let's see. Let's see if I have page numbers for you, sir. Is it the document you're referring to or somebody- Yeah. So there's the November 2013 letter, which is in the record. And it uses the word censor, I'm sure. Well, it doesn't use the word censor, Your Honor. But it does say you should remove things from search results. And it does say that you should put warnings next to kinds of search results. And it does say that these are the things you have to do if you want to avoid incurring liability. So that's a pretty substantial threat, I would say, standing alone. But of course, it doesn't stand alone. And just to give you the record site for that letter. Sorry, that's not the record site for it. But I'll get you the record site in a moment for where the letter appears. But it's in the record a couple of times. Well, the main thing that's helpful is saying what the quality of the evidence is. If it's a document, a letter, tell us. So there's a letter. Only if it's a witness, then say that. And not just a conclusory statement of it's X. We're going to look for it. But if some witness got on the stand and said X, just tell us. Witness A, B, C. If it's a letter, then we have a better sense of what you're saying is the evidence. Counsel opposite said the bad faith matter is stated conclusively by the district court. That it is not anchored to evidence. This kind of question is to discern what is the evidentiary basis. Do you follow me? I do, and I'm trying to get there. I hear you, but just tell us. Go ahead. So first, there's the November 13th letter. Excuse me, the number, I think it's the November 27th letter of 2013, which is in the record, in which the Attorney General lays out various things that Google needs to do, in his view, to avoid further liability. Suggesting we've already incurred liability. This is what we need to do to avoid further liability. And one of the things that's prominent there is that we need to delist. That is, remove entire websites from search results. That's a request for censorship, I think it's fair to say. And it's a threat of liability if we don't do it. That is not, of course, the only one. There are repeated public statements. There are statements at the National Association of Attorney Generals meeting in February of 2014, and this is in the record, where he says, here's the difference between what I'm demanding and what they're willing to do. And he says, what I'm saying they should do is delist. Remove things from search results. That's a request for censorship. There is his press conference that he calls on December 18th of 2014, and the transcript of that is in the record. And in that transcript, what he says is, this is a company that is assisting in a crime, should clearly be convicted of a felony, and there's going to be a court battle. I don't think I'm over-reading that to say that that is a threat of prosecution. Right, those are public statements. But I guess I still don't understand, why don't you just file a motion to quash? A couple of reasons for that, Your Honor. And then you get in there, you go line by line through this document, and you've got, I think the standard is, you've got to show no conceivable relevance. Well, a couple of— Or bad faith. Right. There are two sets of problems with the motion to quash, or maybe three sets of problems with the motion to quash alternative. First problem is that, at best, that would only get us, at best, half of the problem, because we have a problem here, not just with the subpoena, but with what I think are quite clear threats of prosecution. And that is something that we are entitled to redress, and that federal courts are available to redress. And so if we file the motion to quash in state court as to the subpoena, we would be stuck in a piecemeal litigation with addressing the subpoena in one court, addressing the threats probably in another court, and we'd have all the inefficiencies and the risks of inconsistent judgments that are entailed by such a proceeding. That's the first problem. The second problem is that, if we did this by way of a motion to quash, it is not at all clear that the core arguments that we are making here could be heard. Mr. Merkle suggested that that was the case, but what the Attorney General has said in other cases— and I'll cite you to the Gulf Coast Claims Facility case— what he said in state chancery court was, there are only three things for the court to consider. Am I conducting investigation? Do I say that this is relevant to my investigation? And is there a reason to think that the person who I've asked has the information that I've requested? That's what he said in a brief he filed were the only things. And he said in that case, it's just a distraction that the court should not consider whether the conduct that I'm looking at even fits within the statute. That was his position in 2012 in chancery court. So it's a little rich for them to come into court now and say, oh, you could do all of this by way of a motion to quash proceeding. It's not at all clear that we could do all of this by way of a motion to quash proceeding. Their position has been it would be a distraction to ask the court to get into the fundamental issue about whether what they're investigating is, in fact, something we're completely immunizing. But how do you know that without ever having, you know, filed a motion to quash? You're trying to say be home cooking? The Mississippi court's going to embrace the Attorney General? All I'm telling you is that's the legal standard they suggested would apply there. And then I would also note that, you know, we've brought a 1983 action. And it is perfectly clear that under Section 1983, there is no exhaustion requirement. And I think this suggestion, oh, you should have gone to state court and brought a motion to quash, is essentially an effort to import into a 1983 action an exhaustion requirement that the Supreme Court has repeatedly said does not exist. And the reason it doesn't exist is that Section 1983 is designed as a supplemental remedy. And the Supreme Court has said that over and over again. It's a supplemental remedy. And the whole point of it is that you don't have to go to state court to get relief when federal rights are in jeopardy. I want to speak for a minute. That's that argument is elaborated in your brief? Yes, it is. Okay. It is. And the principal authority? Monroe v. Pape is the principal authority. And I think there's a case more recently, I think it's Patsy, in which the Fifth Circuit had actually said maybe there's a narrow category of cases where there should be an exhaustion requirement. And the Supreme Court said, no, there's not an exhaustion requirement under 1983, period. Your first point about threats would be piecemeal. Mississippi's civil rule is identical to the federal rule, 45D. It doesn't contemplate just oppressive, onerous, and unreasonable, but it says or brought in bad faith. So it would seem to me that a motion to quash federally and in state is precisely how a court is going to determine whether there's no conceivable relevance. It's being done for retaliatory purpose. We would certainly have made that argument in state court. I was just pointing out that the Attorney General has taken a very different position. But if you've got an adequate remedy of law that exists with actually our enterprises, Nixon, Brandsburg, in the First Amendment context, they're all saying move to quash. Right. So a couple of points on that. I think, first of all, this notion—step back. I don't think you can look at this case as just being about a subpoena. I've detailed what I think are clear threats of prosecution. And I think you've got to look at a case like Bantam Books. Bantam Books says that when there is an effort to coerce censorship, what the court should do is look at the substance of what's going on and not at the forms. The substance here, as we've laid out in the various threats and demands that the Attorney General made, was an attempt to coerce us to become a censor of what's available on the Internet. If we're right about that submission, then what Bantam Books says is look at the substance, not the form. And I think the district court didn't have to go and disaggregate all the different steps that the Attorney General had taken and say, does this one step by itself constitute irreparable harm? Is there some other place you could remedy this one step? He was entitled to look at that whole course of conduct and say, I look at it as a matter of substance. This is an effort to coerce censorship. It's appropriate to enjoin it. Or all he did in this case, of course, is just preliminarily enjoin it so that the merits can be assessed. All right. How about shift gears and address the Younger issue and the prongs of the preliminary injunction? Certainly, Your Honor. On Younger, I think a couple of points. First, I think Louisiana debating is an important case here. And as Judge Higginson points out, it stands for the proposition that threats are not enough to warrant abstention. You need a pending civil proceeding. Supreme Court has never said that a mere administrative subpoena is a pending civil proceeding. The Treanor case, I confess, I don't think it's cited in the briefs. I don't remember reading it. But as it was described by Mr. Clement, it seemed to involve a court order, which the would be a very different thing. That would fall into the classic third category of Younger abstention, which isn't present here. The Southern District case that he referred to from Judge Wood. I mean, Second Circuit, as we explained in our brief, has walked away from a whole bunch of district court cases that were decided pre-sprint that said a subpoena is enough. And they've said, no, you have to analyze it differently after sprint. And they've looked for things beyond just the administrative subpoena. And I think the important point is that— So Ligman is a pre-sprint decision? Yes. Yes, it is. I think the important point about abstention is you need to have some proceeding that's already pending that the federal court ought to be abstaining in favor of. There isn't a proceeding that's already pending. They're saying we could create a proceeding in state court by filing a motion to quash. There is no case that says if you could create a proceeding in state court, you have to abstain. It has to already be pending. And Sprint couldn't be clearer that— They concede that this isn't self-executing. They concede that. In fact, they trumpeted it. Right. And I mean— But again, that makes me question whether it's hardship. Any big third-party subpoena recipient isn't going to like the time and money. But if you don't have something imminent and specific, and that gets back to what's the most specific threat given to your client? Of adverse legal action. Well, I think it's the— There are several of them. There is the statement in the November 2013 letter that if you don't change various things, you have to change various things in order to avoid incurring further liability. I think that's pretty specific. There are the statements— Right, but you've acknowledged. I mean, you guys mutually, with a great deal of cooperation, set up the flagging system, and then you took things down. So this dialogue that's heated between you has led to corrective action. It's significant. Well, just to be clear, the flagging system— There are two flagging systems here. What the Attorney General asked for was an ability to tell us when he wanted something removed from search results, and we never agreed to that. YouTube has a flagging system. YouTube is a hosted video community, and we take flags from users all the time on YouTube, and we simply gave him the ability to be like any other user and give us flags on YouTube. So we absolutely have not agreed that a flagging system for search results are appropriate. We've never agreed to that. That is a request for a prior restraint on speech, and it's at the core of what the First Amendment forbids the State Attorney General from asking for. You know, it doesn't—it's not a nothing thing for a State Attorney General to come and say, I'd like the ability to censor your speech. That's a very serious thing, and that, I think, is different from some of the other kinds of investigations that Mr. Clement is talking about. But I want to get to your question about irreparable harm as squarely as I can. I think there are three kinds of irreparable harm here, at least. And the first is, as we're following from Bantam books and the fact that we have not just a subpoena standing alone, but a subpoena coupled with threats of prosecution as part of an effort to coerce censorship, the district court found that that had a great likelihood of chilling our First Amendment rights. That's a perfectly reasonable finding. When a State Attorney General threatens you with prosecution, the easiest thing in the world to do is to kind of try and find some way to get along. And that's exactly the kind of chilling effect that's highly problematic. So if you look at the substance of what's going on here, you don't have to disaggregate it and say, does each step that the Attorney General took by itself constitute irreparable harm? You look at the whole picture. If we've got irreparable harm in the whole picture, as I think we do based on the chilling effect, that's enough. That's the first kind of irreparable harm. The second kind of irreparable harm is, you think about what the choice we were put to by the issuance of the subpoena, a choice that I would suggest, the fact that there is a motion to quash available doesn't really remedy. And that is, when this subpoena was issued, Google had the choice of either going along, even though we thought we had an immunity from providing some of this stuff under the CDA, even though we thought it was a retaliation for exercising First Amendment rights, one choice was to go ahead and produce anyway. A second choice that was available to us was to stand on our rights and say, no, we're not going to produce any of this stuff. Either we'll file a motion to quash or you should file a motion to compel, but we're not going to produce anything. That's, you know, this is not a self-executing subpoena, but that's not a costless choice and it's not just the burdens of litigation. Right, but I mean, I guess I sort of, how do you harmonize it with Brandsburg, right? The newspaper doesn't want to allow its witness, its reporter, to go testify about its confidential sources, but they have to. Sure. And that's the same cost. I mean, you don't want to describe it, but if Google had a platform that were assisting something like the Silk Road, if Google were taking any affirmative act to profit off or post this, you wouldn't deny that their subpoena would be appropriate and you, there would be no immunity. I would still deny that this subpoena would be inappropriate. I know, but then you get into why not quash this subpoena for its overbreadth? Well, look, just, just to stay on the second kind and then I'll get to the third kind of reparable harm if I can for a moment. I see my red light is on, but does that include my extra two minutes? Margaret, did you add, you added his two? All right, give him. So on the second kind of reparable harm, we were put to the choice because there are serious sanctions under Mississippi law for not complying with the subpoena and, and they include, it's not a self-executing subpoena. You have to go and get a court order for these sanctions to apply, but you expose yourself when you refuse to comply to these sanctions. No sanctions are up to it, including losing the right to do business in Mississippi. So it's not a free choice to just go and litigate in the state court. You expose yourself to the threat of sanctions if you do that. So... Get a hearing, right? Absolutely get a hearing. And that hearing you could subpoena them in and try to get to the bottom as to whether there's bad faith here. Very unclear whether we could subpoena them in or not. Their position has been that it's a summary proceeding and that you don't need testimony of witnesses and things like that. But let me just finish the point because this is important and I know my time is almost up. You know, if you, if you look at cases like Cuomo v. Clearinghouse, cases like Bunning, cases like Crist, multiple cases that we've cited where federal courts have joined state officials from asking questions in areas that were fenced off from state authority by federal law. And we think we have that here because the core of what the subpoena is focused on from the first request forward is immunized activity. And, you know, as you pointed out, Your Honor, we said to them, hey, can't we narrow this to cut out the immunized activity? And their position was that federal law placed no limits on what they can do. This is a form of irreparable harm that's been recognized in those other cases. It would not be novel for this court to say, hey, when you're trying to intrude on a federal immunity and investigate an area where you don't have authority, the federal court can come in and say, no, if I let this go forward and just deal with this as an ordinary state process, I've denied you the full benefit of that immunity and that's a harm. So that's the second kind of harm. The third kind of harm, I think, is the kind of harm this Court found in Bishop and Wilson, which is if we're right that there was bad faith here, I've tried to describe in the time available why I think we are right, then it follows that being subjected to state activity in bad faith is itself a kind of bad faith that is not remedied by the fact that a state court might ultimately rule that you're right. I mean, that's the holding of Bishop and Wilson. And so we think— Wilson, we remanded for more specific findings. That's absolutely correct. But the holding is that if the more specific findings bear out, that the bad faith— The specific findings are may, may, as was pointed out. The district court really didn't tie the knot on bad faith. Well, I mean, I think, respectfully, I sort of read that language as the district court trying to make clear that he wasn't making an ultimate determination of the merits of the case, but was simply working at the preliminary injunction stage. I think that's the fairest way to read that language. I see that my time is up. So unless there are further questions, we'll rest on our briefs. All right. Thank you. We're back to Mr. Miracle for a rebuttal. Thank you. A few more points about the record. At ROA 397, the Attorney General tells Google the state of Mississippi is investigating and evaluating Google's conduct. The purpose of this investigation is to determine whether there exists any violation of Mississippi law.  Litigation. I don't think there's anything remarkable about the Attorney General having a dialogue in an investigation, which is what attorneys generals do, telling a company that, oh, by the way, under this statute, here's what this could be. He's telling them, this is the statute I'm operating under. So I don't think there's anything remarkable about this investigation. And in that vein, there's been a lot of discussion about the subpoena in terms of retaliation, and the lower court even focused on this. But I think it's important and instructive to look at the U.S. v. Powell decision on administrative subpoenas in the federal court, where the court said under the limited review for issuance with such a subpoena in federal court, there are only two questions. Whether the investigation is for a proper statutory purpose. Yes, we meet that here without question under the Mississippi Consumer Protection Act. And two, whether— You say that, but there's no case anywhere in the country that's ever been brought to enforce consumer protection. State. Against a—I mean, Mississippi has brought consumer protection. Against a search company? No, no, Your Honor. No, we have brought Consumer Protection Act, not against a search company. And you could have submitted anything in camera to the district court if you felt like it was too preliminary and you didn't want them to see what you're looking at. There's nothing stopping you from an in-camera submission. No, Your Honor, but I mean, we were completely hamstrung by the fact that we're told on the front end, we can't get any of your documents, but then during the preliminary injunction proceeding, being told that we have absolutely no evidence to support or defend the preliminary injunction, so it's really a Hobson's choice of accept what they say is true or do nothing. And my one final point I want to make is there is an exhaustion requirement in Younger. Footnote 15 of Judge Wisdom's decision in Despain addresses that point. And finally, Your Honor, there is no case authority—he mentioned their questioned ability as to whether they could raise this in the state court. There's certainly no authority cited where that could not be raised in the lower court and whatever position the Attorney General may have taken in another case, it certainly does not preclude the court from entertaining all claims. And of course, this court and the Supreme Court has said that state courts are fully capable and we know they are of adjudicating these issues. If there are no further questions, I see my time is up and I will rely on our brief for the remainder of the points we submit to the court. I think there's a remaining question. Do you have a question? You're familiar with the MySpace decision by the court? Yes. So would it be—is it a correct statement that Mississippi is not seeking in any way to have them correct or replace third-party postings? Mississippi's sole interest from an investigative standpoint and this subpoena is to discover whether they promoted illegality themselves. Is that a fair statement that you're not asking them to correct and replace third-party content? You accept they can't be asked that under our decision? Yes, and what I would specifically point to in the record at ROA 647 is the Attorney General told in that November letter that Mr. Nyman referenced, the Attorney General said the AG is investigating the actions of Google, not investigating for the actions of others. Now, does that mean in the course of the investigation, there is going to be—and let me just make a real quick example because I know I'm over my time—but the monetization of ads. So if a YouTube ad is put on there and Google puts an ad out to the column or runs a prequel before what's a pirated movie, there could be questions about just because it involves third-party content, just because the content is there. Google has created other business models since 1996 when it was a search engine. There are a lot of other business models. Those are the types of things that the Attorney General is investigating. All right. All right. Thank you, counsel. If all sides—before we call up case number three, the panel will be in a short recess.